LAURA C. HAVILAND, petitioner-appellant,

*v.*

HENRY F. HAVILAND, defendant-respondent.

[Submitted May 26th, 1933.   Decided September 27th, 1933.]

*Mr. James F. X. O'Brien,* for the petitioner-appellant.

*Messrs. Harrison & Roche,* for the defendant-appellant.

The opinion of the court was delivered by

PERSKIE, J.

This appeal brings up for review a decree of the court of chancery made upon the advice of Advisory Master, Mr. Francis Child, by which decree the wife's petition for divorce was dismissed and the husband's counter-claim for divorce was sustained.   Each alleged simple desertion in January, 1928.   *Wood* v. *Wood, 97 N. J. Eq. 1.*   Each charged the other with refusal to have sexual intercourse.   This case presents simply a factual question.   Which spouse deserted the other?   We, of course, give great weight on an appeal from a decree of the court of chancery, to a finding on a

question of fact. *Cartan* v. *Phelps, 91 N. J. Eq. 312.* We are of the opinion that there was sufficient testimony adduced to justify the conclusions reached by the master. The testimony is prolix. Briefly, it is as follows: Petitioner and defendant were married on November 13th, 1904, at Bloomfield, New Jersey. Two children were born of the marriage, a daughter, Adine, on March 17th, 1909, and a son, Harry Field, on September 7th, 1919. After the marriage the parties resided in New Jersey for about four years and then went to Chicago, where they resided until 1915 or 1916. Thereafter they returned to New Jersey and resided therein until 1922. They then moved to Baltimore, Maryland, and again returned to New Jersey in 1926, taking up their residence in East Orange. Since that time they have always resided in New Jersey, living together in the same house until February, 1930, when the petitioner left her husband. She filed a petition for divorce against her husband in March, 1930, charging simple desertion in January, 1928. Defendant, husband, filed an answer denying desertion, and a counter-claim alleging desertion on the part of the wife in January, 1928. On September 11th, 1931, petitioner filed an amended petition alleging extreme cruelty and constructive desertion. Petitioner later withdrew the amended petition and proceeded with the original petition charging simple desertion.

We thus start with the undisputed premise that no intercourse was had between the parties since January, 1928. Now what were some of the facts and surrounding circumstances (*Robinson* v. *Robinson, 83 N. J. Eq. 150; affirmed, 84 N. J. Eq. 201*) upon which the master based his findings? The husband says that in January, February and March, 1928, and on several other occasions his wife refused him. (Testimony of husband):

"*Q.* Prior to that do you mean, had you asked her to—— *A.* Not at the time. She not only refused me but she made a very definite statement that she was through with me and that she never intended to have anything more to do with me. *Q.* And did she say why? *A.* She did not.

By the court—"*Q*. Did you ask her why she was through with you? *A*. I did, yes. *Q*. What did she say? *A*. She said she had no use for me any more \* \* \*."

"*Q*. Now following after this January episode, the middle of January refusal, did you make any subsequent advances to her? *A*. I did. *Q*. When and with what result? *A*. It was around the middle of February, 1928, was one time, and one was around the middle of March, 1928. I place both of these dates rather definitely in my mind on account of my birthday coming on March 17th, and I know they were somewheres around those dates. Both times she simply told me that she—she said, 'I have already told you, Henry, that I am through with that sort of thing.' And I said, 'don't you want to make up?' And she said, 'I don't know. I cannot discuss it now.' *Q*. Did she give any reasons for her refusal? *A*. She—never; she gave no reason. *Q*. Did she say whether or not she had lost affection for you? *A*. She didn't say it in so many words. *Q*. What did she say? *A*. She also said she would have nothing to do with me, and refused to talk about it. A favorite expression of hers was, 'as I have told you before, Henry, I will have nothing to do with you."

The wife admits that she refused her husband in January and February, 1928, but seeks to explain the denials by saying that on one occasion she was sick and on the other occasion because the husband was intoxicated. The husband denies the charge of intoxication. She, however, admits that she denied him on some other occasions. (Testimony of wife) :

"*Q*. Prior to your husband's being, as you say, intoxicated—in an intoxicated condition in January, 1928, had you refused, under normal conditions, to share the same bed with him? *A*. Prior to that time? *Q*. Yes. *A*. I had on some occasions, yes. *Q*. You had refused? *A*. I had refused."

But this is not all. There were other very strong and convincing circumstances that it was the wife and not the husband that was guilty of desertion. The testimony clearly indicates that they commenced to drift apart while they resided in Baltimore. When they returned to New Jersey they continued to further drift apart in their marital relationship.

The wife was a high strung, nervous person. She was continuously changing her lawyers and doctors. It may well be that the husband, although he denies it, was unduly critical of his wife's clothes, expenditures, friends, cooking, particularly her inability to make biscuits. It is not difficult to understand why the master believed the husband and not the wife. Her answer to the master as to a part of the taxi episode is very illustrative and persuasive. (Testimony of wife):

"*Q.* Was your sister present when your husband was following you about in his automobile? *A.* No, my sister was not. *Q.* Where was she? *A.* Yes, she was there. She said she was. Of course she was. That is, I guess she was. I was—I don't know. I was so excited, I don't know what happened."

The husband was in the laundry business. He arose to go to work six o'clock in the morning and worked until about six o'clock in the evening. When he came home he was naturally tired, and retired early. The wife, on the other hand, apparently enjoyed club life and night life. Frequently it appears that she went out without her husband or his knowledge and stayed away until five or six o'clock in the morning. The testimony clearly proves that she went out when she pleased, with whom she pleased. It is evident that she did not care for her husband's companionship. Her refusal to join her husband as the guests of Mr. and Mrs. Gilbert Benedict for a midnight supper after a theatre party is irrefutable. She would not accompany her husband because she said she was feeling ill. The husband said that she did not look sick to him and that he said to her that he believed she was just refusing to go because she did not want to go with him and he refused to go alone. Finally she insisted upon his going and she said: "You go ahead; I am going to bed." The husband went alone. He returned home between two and three o'clock in the morning. The wife was not home. She did not return until six o'clock in the morning and refused to tell her husband where she had been and with whom she had been.

She started in the real estate business in 1928. This apparently required entertainment of prospective purchasers. She neglected the care of her son. Many times he would come home from school for lunch and find that it was not prepared for him. As a result thereof he spent a great deal of his time and received maternal care at the hands of one Mrs. Carpenter. When the daughter returned home from school, she observed the strained relationship between the father and mother. The testimony discloses that the wife not only ceased to care for her husband but became utterly unmindful of her duties and obligations which she owed as a wife. All this, and much more that the record discloses, the husband says, had a most distressing effect upon him and seriously interfered with the proper operation of his laundry business. He confided with his brother, David Haviland, with whom he was associated in the said business, and Mrs. Ruby Failing as to his marital difficulties. *Haskell* v. *Haskell, 99 N. J. Eq. 399.*

The testimony further discloses that the husband sought to effect a reconciliation on several occasions. That the wife was not interested was illustrated on one occasion by her statement that she would give an answer to his plea upon her return from a trip to Cuba. As a matter of fact she did not go to Cuba nor did she ever give her husband an answer. In addition to his own entreaties the husband had others (Mrs. Failing and Mrs. Carpenter) intercede. But all of no avail. She clearly indicated that she was through with her husband. (Testimony of Mrs. Carpenter) :

"*Q.* Will you briefly tell where this incident happened, and the statements made by the parties concerned, in Mrs. Haviland's presence, or by Mrs. Haviland to you, or in your presence? *A.* Yes, I was in the back yard on my side of the back yard, and Mrs. Failing and her mother were sitting in the yard swinging, and Mrs. Haviland was sitting on a bench, and I was sitting on a chair. And Mrs. Haviland and Mrs. Failing were having an argument. And Mrs. Haviland made the statement that she was positively through with her husband; he was to go his way and she was going her way. *Q.*

What brought about that statement, do you know? *A.* Well, Mrs. Failing was criticizing Mrs. Haviland the way she was leaving her home, and she was not home to get the meals."

The unjustified refusal of sexual intercourse by the wife persisted in willfully, obstinately and continuously for the statutory period of two years is a ground for divorce for the cause of desertion. *Rector* v. *Rector, 78 N. J. Eq. 386* (at *p. 404*); *Parmly* v. *Parmly, 90 N. J. Eq. 490; McLain* v. *McLain, 91 N. J. Eq. 530,* and *Haskell* v. *Haskell, supra.*

The decree under review will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 14.

*For reversal*—None