ROBERT M. BAXTER, JR., petitioner-appellant,

*v.*

MAUDE COLEMAN BAXTER, defendant-respondent.

[Submitted October 29th, 1926.    Decided February 8th, 1927.]

1. A wife's desertion of her husband cannot be adjudged obstinate unless it has resisted such efforts on the part of the husband as he ought to have made to bring it to an end, under the circumstances of the case.

2. On the evidence in this case, *held,* that conceding there was a desertion of the husband by the wife, his conduct was to some extent contributory thereto, and that his subsequent invitations to her to return were not such as might be reasonably expected to bring about that result; and hence, that the desertion, if there was a desertion, was not obstinate.

On appeal from a decree of the court of chancery, dismissing petition for divorce.

*Mr. Lewis G. Hansen,* for the appellant.

*Mr. Thomas J. Huckin,* for the respondent.

The opinion of the court was delivered by

PARKER, J.

This is a husband's suit for divorce on the ground of desertion, and was tried before Vice-Chancellor Bentley, who in an oral decision held in substance that the wife had deserted her husband, that the desertion was willful and continued, but was not shown to be obstinate, in the sense contemplated by our statute as construed by a long line of decisions; and therefore denied the prayer of the petition.

We concur in that result.

The parties were married in 1909 and lived together for fourteen years, separating at the end of May, 1923. They have one child, a daughter, born in 1915. For some months before the rupture they were obviously on bad terms, the reasons for this being somewhat obscure, as often happens in this class of cases. At the time they were living at Englewood in a house the title to which stood in the name of the wife. The husband was employed in a bank; the amount of his income is not stated in the evidence. According to the wife's testimony he was disposed to live beyond his means and run into debt, and her protests irritated him. She accepted employment temporarily, then permanently, as a teacher in a public school at Tenafly, and intimates that this, combined with attending to the household and the child, was too much for her strength, as it may well have been. He objected to her teaching, but she persisted. In February, 1923, there was a breach; he left her bed and did not return to it. She testified, and we incline to credit the testimony, that "he had been very morose and quiet, and when I asked him what was the cause of it he said he no longer cared for me; I was a millstone around his neck and I kept him back, and he thought the best thing to do was to sell the house, and when the house was sold he would separate." She protested, but submitted, and later a contract of sale of the house was signed and the

title passed on May 31st, 1923, the husband and wife meeting on formal terms at the lawyer's office. He seems to have received the first payment; the final one was taken by her with his consent so far as appears. She left and went to stay with a sister; he rented the house they had just sold, for a month, and alleged surprise at her removal of the furniture which she says was by mutual arrangement. She took the child; did not give him her new address in the Bronx; he learned it from the post office, tried unsuccessfully to see her there, and at once consulted counsel. There seems to have been a *habeas corpus* proceeding for the production of the child very shortly afterwards, the record of which is not before us; but it does appear that the parties met at the court room or in the elevator on the way to it, that he embraced the child without recognition of the mother, and at that time made no overture of any kind toward a reconciliation. He complained of being unable to find her or see her, but admitted that he knew she was teaching in a public school a mile from where he lived, and went there only once, to find she had left for the week-end. He wrote her several letters from time to time, all of which were registered, with demand for return receipt. He says that was the only way to induce her to answer; her answers say she is willing and ready to answer.

In July, 1923, he rented an apartment in Jersey City which he occupied till September, 1925, though he had good reason to believe, if he did not know, that she was continuing her teaching at the Tenafly school. He seems to have contributed nothing to her support until after he filed his petition and was directed by the court to do so. He spoke with her once or twice over the telephone, perhaps oftener. His letters are not of the kind calculated to encourage a wife to return. The first, June 1st, 1923, says in part: "I would like to have you return to the home and fulfill your duties as a wife." On the same day his lawyer wrote her in the vein usual in such cases. The next letter from petitioner is dated June 11th, makes no allusion to her returning but says that "as her husband and the father of Dorothy he wants to know where she and Dorothy are living" to the end that he may

see (not her, but) Dorothy.  The next letter, dated July 27th, announces the removal to Van Reypen street, Jersey City, a location characterized by him as very convenient to his business, and again asks her to "return home and perform her wifely duties" and bring back the child; he suggests her calling at his office in New York to talk matters over.  At the time this letter should have been received in the course of the mail, there appeared in the Englewood paper the first insertion of an advertisement that as she had left his bed and board he would not be responsible for debts of her contracting, which was published three times.  To his letter she replied somewhat indignantly, but not intemperately, calling attention to the advertisement and to his failure to provide any support, even for the child, and asking him to wait till she, defendant, had finished her summer vacation at Patchogue and recuperated to such an extent as to discuss matters and reach an understanding.

The subsequent letters from him are in a similar vein, and no good purpose would be served by setting them down in any detail.  He writes of having always given her a better home than she had before marriage; recurs to her "wifely duties," again and again; and the tone of the letters becomes gradually harsher.  A perusal of them should satisfy any reasonable mind that if, as his wife testified, he told her in February, 1923, that he no longer cared for her, he spoke truly.

The rule in cases of this kind has been settled in a number of our decisions, a leading authority being *Hall* v. *Hall, 60 N. J. Eq. 469,* where it was said:

"That a desertion, in order to be obstinate, must be persisted in against the willingness of the injured party to have it concluded is declared by all our cases; and, ordinarily, when the husband has, by his conduct toward his wife, contributed in any degree to her original desertion, the law requires that he should evidence that willingness by making such advances or concessions to his wife as might be reasonably expected to induce her to return to him."  (Citing cases.)

The same rule was stated in slightly different language by Vice-Chancellor Leaming, in the recent case of *Davenport* v. *Davenport, 97 N. J. Eq. 14,* where he said:

"A wife's desertion, though willful, cannot be adjudged obstinate unless it has resisted such efforts or concessions on the part of her husband as he ought to have made to bring it to an end, under the particular circumstances of the case."

The authorities are collected in that opinion, and need not be repeated here.

This case is not within the exception noted in the *Hall Case,* and on which that decision turned. Our reading of the evidence satisfies us that the separation was due in large measure to the conduct of the husband; that his wife left him because she had concluded, if perhaps erroneously, still justifiably, that she was not wanted; that there was nothing in her conduct to justify the conclusion that it would be useless to ask her to come back, and that a series of registered letters enlarging on her "wifely duties" without one phrase of affection in them, accompanied by a lawyer's letter and an advertisement repudiating responsibility for her debts, was very far from being the course of conduct that would naturally tend to induce her to return. The vice-chancellor, therefore, properly held that her desertion, conceding that it was a desertion, was not obstinate, and the decree dismissing the petition will therefore be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, VAN BUSKIRK, McGLENNON, KAYS, HETFIELD, JJ. 13.

*For reversal*—None.